| | |
|---|---|
| MICHELLE LABRIOLA and ANNA LAPINA, individually and on behalf of all persons similarly situated as class representative under Illinois Law and/or as members of a Collective under the Fair Labor Standards Act,<br><br>Plaintiffs,<br><br>v.<br><br>CLINTON ENTERTAINMENT MANAGEMENT, LLC, d/b/a THE PINK MONKEY, and JOHN DOES 1 and 2,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 15 C 4123<br>)<br>)  Judge Rebecca R. Pallmeyer<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

For a period in 2015, Plaintiffs Michelle Labriola and Anna Lapina worked as exotic dancers at the Pink Monkey, a club operated by Clinton Entertainment, LLC ("Defendant" or "Club"). Plaintiffs claim that they were paid less than the federal and state minimum wage, that they were not paid overtime wages, and that the Club unlawfully confiscated a portion of their tips. They brought a putative class action on behalf of all dancers at the Pink Monkey, alleging violations of the Fair Labor Standards Act (FLSA), the Illinois Minimum Wage Law (IMWL), unjust enrichment, and quantum meruit. Plaintiffs have moved for class certification, and Defendant has moved for summary judgment. For the reasons stated below, summary judgment is granted on the FLSA claims asserted by Labriola and Lapina, and on one of the unjust enrichment/quantum meruit claims. The remaining claims asserted by these Plaintiffs will be dismissed without prejudice. Plaintiffs' motion for class certification is denied as moot.

## BACKGROUND

### I.   Factual History

#### A.   The Pink Monkey

Labriola and Lapina worked as exotic dancers at the Pink Monkey Gentlemen's Club for a few weeks in January and February 2015 and July and August 2015, respectively. (Def.'s

Rule 56.1 Statement of Facts ("DSOF") [78] ¶ 13–15.)  The Club classified its dancers, including Plaintiffs, as independent contractors.  The Club sent Plaintiffs 1099 tax forms for 2015 showing their earnings from the fixed dance fees they collected, as well as the fees that the dancers paid, which they could deduct as expenses.  (Ex. J to Aff. of Tiffany Kalicki ("Kalicki Aff.") [79-10]; Ex. K to Kalicki Aff. [79-11].)  The 1099 forms for Plaintiffs state that Lapina's 2015 dance fee earnings were $2578, while Labriola's were $6,280.  (*Id.*)

In this lawsuit, Plaintiffs contend that they were employees, not contractors.  A variety of factors influence the determination of how a worker is properly classified, and the parties have addressed several of them.  For example, Plaintiffs claim that the Club controlled their activities by enforcing rules for the dancers, while Defendant claims that these "rules" were not actually enforced, and therefore are really nothing more than "suggestions."  (DSOF ¶ 30.)  Many of these disputed "rules"/"suggestions" are contained in the Pink Monkey Gentleman's Club Information ("Handbook"), labelled as "rules," "policies," or "checklists."  (Ex. 3 to Pl.'s Statement of Add'l Facts ("PSOAF") [92-2].)  Whatever labels are assigned, there is conflicting evidence about how strictly the "rules" were enforced.

The nature of Plaintiffs' compensation is also disputed.  Defendant emphasizes that the dancers were paid based on the number and type of dance they did, rather than by the hour.  Specifically, the Club charged customers a fee for each dance.  For a "cabana dance,"[1] customers paid $30, of which the dancer would keep $25 and the Club would keep $5.  (DSOF ¶ 35.)  Dancers would collect the money for cabana dances directly from customers, and pay the Club the $5 per dance fee at the end of the night.  (Ex. 3 to PSOAF at 014.)  For private dances in what was known as the VIP room, customers would pay a dance fee that varied based on the length of the dance and whether the customer paid cash or by credit card; the dancer would keep a certain amount of that dance fee according to the following schedule:

---

[1]      Though not defined, it appears that cabana dances are known colloquially as "lap dances."  (*See* First Labriola Decl., Ex. 1 to PSOAF ("First Labriola Decl.") [92-2] ¶¶ 13, 21.)

| Time | Cash | | Credit Card | |
|---|---|---|---|---|
| | Total Charge | Dancer's Portion | Total Charge | Dancer's Portion |
| 15 minutes | $200 | $120 | $220 | $108 |
| 30 minutes | $350 | $250 | $385 | $225 |
| 60 minutes | $600 | $420 | $660 | $378 |

(DSOF ¶¶ 36–37.)[2]  For VIP dances, the customer would pay the Club directly, and the Club would give dancers their portion at the end of night.  (DSOF ¶ 40.)

Fees for the cabana dances and VIP dances were fixed; neither customers nor dancers could change the prices.  (Pl.'s Resp. to DSOF [93] ¶¶ 34–36, 38.)  The Club kept a record of the number and types of dances performed by each dancer during each night, and distributed each dancer's portion of the fees at the end of the night.  (DSOF ¶¶ 39–41.)  The Club recorded the total dance fees (including the dancers' portions) and its distributions to the dancers in its accounting statements as part of its gross receipts and costs, respectively.  (*See* Ex. A to Weisberg Aff. [81-1]; Ex. B to Weisberg Aff. [81-2].)  Copies of these accounting statements are in the record, and the Club's accountant and tax preparer, Michael Weisberg, confirmed that dance fees were included in the Club's gross receipts.  (Weisberg Aff. [81] ¶¶ 1, 3–4, 8.)

The dance price schedule appears in the Club Handbook, and is posted on the Club wall in the dancers' locker room and by the manager's office.  (Pl.'s Resp. to DSOF ¶ 34; Ex. 3 to PSOAF.)  The court is not certain who created the Handbook, or the Club's policy for distributing the price schedule to dancers, but it is undisputed that both Plaintiffs at least saw the schedule: Lapina admits that the Club gave her the Handbook, and although Labriola disputes that the Club gave her a copy, she admits that she saw the price schedule posted on the wall.  (Pl.'s Resp. to DSOF ¶ 34.)  In addition to the dancers' portion of the dance fees paid to the Club,

---

[2]      The Club apparently thus encouraged customers to pay with cash, both by charging lower overall prices and incentivizing the dancers to encourage cash by giving them a greater portion of cash dance fees.  Whether the customers themselves had access to the dance fee schedule is not clear from the record.

dancers could receive tips from customers; Lapina and Labriola did earn tips in addition to their portion of the dance fees. (*Id.* at ¶¶ 35, 68–69; Kalicki Aff. [79] ¶ 23.)

The Handbook also describes various fees that the dancers were required to pay as a condition of performing at the Club. One such fee was the "DJ/House Mom"[3] or "hospitality" fee: $40 per shift every day except Sundays, when the fee was $20. (Ex. 3 to PSOAF at 010; Kalick Aff. ¶ 9.) Another fee was the "house fee," which varied depending on the time the dancers checked in. (*Id.*) A dancer who checked in at 7:00 PM, when the Club opened, paid the smallest amount, and a dancer who checked in at midnight (or 10:00 PM on Sundays), paid the highest fee. (Ex. 3 to PSOAF at 010.) There were, however, various ways that dancers could earn "free house cards," essentially vouchers for the house fee, by working on certain days or at certain times. (*Id.* at 011) The Handbook also describes "dance fee[s]" of $5 per dance (*id.* at 015)—presumably a reference to the Club's portion of each cabana dance fee charged to customers, rather than an additional fee. (*See* Kalicki Aff.¶¶ 3–9 (listing the various fees that dancers would pay to the Club, and referring to one fee (not two) of $5 per dance).) The dancers would also pay a "floor host fee" of 15% of a dancer's "total commissions" for the night.[4] (*Id.* at ¶ 9.)

---

[3] The court presumes that this fee was meant to compensate both the DJ and the House Mom (job titles held by different individuals, not a single entity). The two individuals who held the title of "House Mom," worked on different days. (Ex. 3 to PSOAF at 011.) One of them, Veronica Martinez, testified that the House Moms have two main duties: to create the schedule for the dancers based on the dancers' requested shifts (Dep. of Veronica Martinez, Ex. C to DSOF ("Martinez Dep.") [78-3] 9:5–11:18), and to assist the dancers before their shifts, such as communicating with dancers who are running late and "help[ing] with [the dancers'] hair." (Martinez Dep. 12:5–13.) (Relevant to the issue of control the Club exercised, the court notes that the title "House Mom" suggests close oversight or protection.)

[4] This fee was also known as a "tip out." (Ex. 3 to PSOAF at 015.) The court is uncertain what is meant by "commissions" in this context—"commissions" are often a reference to a percentage paid to a sales representative, so the court assumes that this refers to the dancer's portion of the dance charges charged to customers. Given the name "tip out," however, "commissions" may refer to the tips that dancers received, which could have implications for Plaintiffs' unjust enrichment claims. Neither party has called any attention to this fee in the Handbook—Plaintiffs allege that they were required to pay all fees out of their tips, not just this particular fee. Because neither party has suggested otherwise, the court interprets the word "commission" as a fixed payment for each dance, rather than a gratuity.

The parties dispute when the dancers paid these fees.[5]  Martinez testified that dancers

would pay their house fees after their shifts ended (Martinez Dep. 32:17–21), but Lapina that

she paid her fees with cash she brought with her to the Club before she started her shift:

> Q:    When you come to the club at work at night, generally how much cash do
>       you have on you?
> . . . .
> Q:    And what about at the Pink Monkey?
> A:    Pink Monkey I would come with money I have to pay for house mom and
>       a DJ because I believe, yes, we paid it before we started shift.
> Q:    So when you were at the Pink Monkey, you would come there with cash
>       that you had from whatever source so you had enough money in order to
>       pay for your shift that night?
> A:    Yes.
> Q:    In order to cover any house fee?
> A:    Yes.
> Q:    In order to cover any DJ, house mom fee?
> A:    Yes.
> Q:    Would you also bring any money to cover any hospitality fee, do you
>       remember what the hospitality fee was?
> A:    What is hospitality fee?
> Q:    Do you recall what the hospitality fee was?
> A:    I don't recall that happening.
> Q:    So with respect to what you recall from the Pink Monkey, you would come
>       to the Pink Money with cash so that you had enough money to pay for the
>       house fee and for any DJ/house mom fee?
> A:    Yes.

(Dep. of Anna Lapina, Ex. F to Answer to Pl.'s Statement of Add'l Facts ("Lapina Dep. in Reply")

[96-6] 129:21–31:13.)[6]  Labriola also testified (at least with respect to one night) that she paid

the fees before her shift.  (Dep. of Michelle Labriola, Ex. B to DSOF ("Labriola Dep.") [78-2]

---

[5]    There is also some uncertainty about to whom they would pay the fees.  The House Mom would collect at least some of the fees, presumably the house fee and DJ/House Mom fee (Martinez Dep. 31:20–24), but it appears that the $5 portion of the dance fee that the Club retained was simply deducted from the earnings distributed to dancers each night.  (*See* Dep. of James Marchese, Ex. 4 to DSOF [78-4] 58:7–16.)

[6]    Plaintiffs' counsel objected to this final question as vague (Lapina Dep. in Reply 131:14), and seems to renew the objection in its Response to Defendant's Statement of Facts. (Pl.'s Resp. to DSOF ¶ 65.)  As Lapina had no trouble answering it, the objection is overruled.

119:1–7.)[7]  Defendants contend that paying the fees before their shifts, as opposed to after, is inconsistent with Plaintiffs' claim that the fees were "seized" from that night's tips.

The parties also dispute whether all the time that dancers spent at the Club, including preparing to dance before their shifts, counted toward the dancers' work time under the FLSA. Lapina testified that some dancers would arrive early to get ready to perform (e.g., change clothes and apply makeup) at the Club, but she acknowledged that doing so was not a requirement; dancers could get ready before arriving at the Club if they wished.  (Dep. of Anna Lapina, Ex. A to DSOF ("Lapina Dep.") [78-1] 101:18–03:5.)  Labriola initially stated that she was "required" to get to work fifteen minutes ahead of her scheduled start time to get ready for work (First Labriola Decl. ¶ 10), but she later acknowledged that she sometimes applied her makeup at home.  (Labriola Dep. 67:14–68:7.)  Dancers did  not "check in"—that is, report to the House Mom and the DJ that they were ready to begin dancing—until they had changed clothes and applied makeup.  (*See* Martinez Dep. 48:23–49:7, 114:15–21.)  House Mom Veronica Martinez estimated that it generally took dancers ten to fifteen minutes to get ready if they were not ready to perform when they arrived.  (*Id.* at 14:2–21.)

Dancers did not leave the Club at precisely the time it closed.  They would first "check out," and receive their portion of the dance fees.  (*See* Pl.'s Resp. to DSOF ¶ 63, Answer to Pl.'s Statement of Add'l Facts ("Def.'s Resp. to PSOAF") [96] ¶¶ 78–79.)[8]  Labriola testified that the dancers would check out beginning at the Club's 4:00 AM closing time (the Club closed at 2:00 AM on Sunday nights).  (Labriola Dep. 76:7–10; *see* Martinez Dep. 13:5–17.)  Martinez testified that dancers checked out with James Marchese, the Club manager, one by one beginning at

---

[7]     Plaintiffs move to strike this testimony on the grounds that it exceeded the scope of the deposition cross examination (Pl.'s Resp. to DSOF ¶ 66), but that is nonsensical.  The "beyond the scope" objection has no purchase in discovery, and Labriola will not be heard to say that her own testimony is false.

[8]     Plaintiffs cite a page of Lapina's deposition that is not in the record (PSOAF [92] ¶ 78 (citing Lapina Dep. 213)), but they also cite an excerpt in the record in which Lapina testified that she left the Club only after she changed clothes and "cashed out."  (Lapina Dep. 207:13–08:5.)

4:00 AM (Martinez Dep. 32:5–16; *see* Aff. of James Marchese ("Marchese Aff.") [80] ¶ 1), a process that Marchese estimated as consuming "probably . . . less than 30 seconds[.]" (Dep. of James Marchese, Ex. 4 to DSOF ("Marchese Dep.") [78-4] 58:6–16.)

### B. Plaintiffs' Earnings and Hours Worked

The parties dispute the number of hours worked and fees earned by each Plaintiff during certain weeks of their employment. Though Labriola and Lapina worked for seven weeks and four weeks, respectively, the parties contest these figures for only one week for Labriola and two weeks for Lapina. For Plaintiff Labriola, the parties dispute the hours she worked during the week of February 2, 2015. For Plaintiff Lapina, the parties dispute the hours worked and amounts earned for the week of August 3, 2015, and the amounts earned for the week of August 10, 2015. Defendant contends that Labriola worked 14 hours during the week of February 2, 2015, and earned $113, and that Lapina worked a total of 37.25 hours, earning $407, during the weeks of August 3 and August 10 combined. Defendant's position is supported by documentary sources, primarily records prepared by Tiffany Kalicki, the Club's Administrator, who is responsible for handling the Club's accounts, expenses, and payroll. (Kalicki Aff. ¶¶ 1, 10.) Kalicki prepared activity logs that calculated dancers' hours, using a start time based on how much the dancer paid for a house fee, and assuming that the dancer worked until the Club closed. (Kalicki Aff. ¶ 10.)

This original activity log, however, is not in the record; the court knows about it only because Kalicki described it. (Kalicki Aff. ¶ 10.) Instead, without providing specifics about its creation, Defendant has provided what it contends is a more accurate Activity Log/Summary Chart;[9] the start times are more accurate, Defendant claims, because they are taken from the "House Mom Daily Log," which lists the time that each dancer checked in with the House Mom as ready to begin dancing. (Kalicki Aff. ¶ 12; Ex. B to Kalicki Aff. [79-2]; Ex. C to Kalicki Aff. [79-

---

[9] The parties seem to refer to this document by a variety of titles. Plaintiffs refer to this as the Activity Log (Ex. 10 to PSOAF [92-5]), while Defendant refers to it as a Summary Chart. (Def.'s Resp. to PSOAF ¶ 49.) The court refers to these documents as "Summary Charts," to distinguish them from the earlier activity logs that are not in the record.

3].) The updated Summary Charts generally assume that dancers worked until the Club closed, unless the Club has evidence of a dancer's earlier end time for a specific day. (Ex. H to Kalicki Aff. ("Lapina Summary Chart") [79-8]; Ex. I to Kalicki Aff. ("Labriola Summary Chart") [79-9].)

### 1. Labriola: Week of February 2, 2015

For the week in question, it is undisputed that Labriola worked on just two days: February 2 and February 3. (Ex. 6 to PSOAF [92-5]; Labriola Summary Chart.) During that week, she earned $113 after paying the various fees. (*Id.*) The parties dispute how many hours she worked, however. Defendant claims that Labriola worked 14 hours that week, as described in the Summary Chart:

| Start Time | End Time |
| --- | --- |
| 2/2/2015 7:15 PM | 2/3/2015 1:51 AM |
| 2/3/2015 7:35 PM | 2/4/2015 2:52 AM |

(Labriola Summary Chart.)

Defendant contends that Labriola stopped at these times, before the Club's ordinary closing time, because the Club closed early on those days due to snow—Defendant contends, and Plaintiffs do not dispute, that it had snowed heavily on February 1, 2015.[10] Defendant points to the time card for the "Door Girl," the Club employee who "checked [dancers] out" at the end of the night;[11] the Door Girl herself left the Club at 1:51 AM on February 3 and 2:52 AM on February 4. (Ex. E to Kalicki Aff. [79-5]; Kalicki Aff. ¶ 13). Tiffany Kalicki, the Club's administrator, stated that the Door Girl "would have left around the same time as, or after,

---

[10] *Historic Winter Storm of January 31–February 2, 2015*, NATIONAL WEATHER SERVICE, http://www.weather.gov/lot/2015_Feb01_Snow (last visited Mar. 10, 2017); Tom Skilling, *Super Bowl Blizzard Officially Chicago's 5th Largest Snowstorm*, WGNTV.COM (Feb. 2, 2015, 7:12 AM), http://wgntv.com/2015/02/02/super-bowl-blizzard-officially-chicagos-5th-largest-snowstorm/.

[11] This appears to conflict with the evidence that it was Marchese who "checked out" dancers at the end of the night, but Martinez testified that the Door Girl's job was to monitor people coming in and out of the front door of the Club. (Dep. of Veronica Martinez, Ex. E to Answer to Pl.'s Statement of Add'l Facts [96-5] 130:7–31:12.) Thus, as the court understands it, the Door Girl's "checking out" function was to call cabs for dancers at the end of the night, to ensure that dancers left the Club safely. (*Id.*; *see also* Marchese Dep. 107:3–15.)

Labriola" (Kalicki Aff. ¶ 13)—presumably the Door Girl could not have checked Labriola out once she herself had left.

Labriola claims that she worked 18 hours over these two days, 9 hours each day. It appears that Labriola does not dispute the start times listed above, but instead asserts that she worked until after the Club's regular 4:00 AM closing time on each of the two days. (Second Labriola Decl., Ex. 4 to PSOAF [92-3] ("Second Labriola Decl.") ¶¶ 40–44.) In support, Labriola first cites a page from Marchese's deposition transcript that is not in the record. (Pl.'s Resp. to DSOF ¶ 45 (citing Marchese Dep. 104).) Labriola cites also to her own declaration (Pl.'s Resp. to DSOF ¶ 45), where she claimed: "According to Pink Monkey's business records, and my own chart of compensation, I worked 18 hours during [the week of February 2, 2015]." (Second Labriola Decl. ¶ 39.) Both Labriola and Lapina submitted "charts of compensation," apparently created for this litigation and setting forth their contentions concerning hours worked and amounts earned for the disputed weeks; Labriola's chart states that she worked 9 hours each day. (Ex. 6 to PSOAF.) Neither chart lists the dancers' start or end times, however, and more importantly, Plaintiffs do not explain what sources they used to create these charts.

### 2. End of Labriola's Employment

Labriola testified that on February 28, 2015, a customer tipped her after she had been dancing on the stage. (Labriola Dep. 58:7–18.) She went to sit with and speak to the customer, who asked Labriola how much money she made in a typical night. (*Id.* at 58:11–59:19; Second Labriola Decl. ¶ 5.) In Labriola's words, the customer then "offered" Labriola a $1,000 tip, which she "accepted."[12] (Second Labriola Decl. ¶¶ 4–7; *see* Labriola Dep. 58:11–59:19.) Defendant claims that the customer reported to a manager, George Vitzileos, that the customer "had

---

[12] Labriola acknowledged that she did not perform any VIP dances for the customer (Labriola Dep. 60:12–15), and the court presumes that tips are ordinarily given without an "offer" or "acceptance;" the precise nature of this negotiation is murky.

agreed to have sex with Labriola in exchange for money."[13]  (Aff. of George Vitzileos, Ex. G to Def.'s Resp. to PSOAF ("Vitzileos Aff.") [96-7] ¶ 2.)  Labriola denies this and has characterized it as a "miscommunication" (Labriola Dep. 58:7–59:19), though she does not say between whom.

According to Labriola, the customer attempted to use the Club's ATM machine to withdraw cash for the $1,000 tip, but the machine was not working.  (Labriola Dep. 58:11–59:19; Second Labriola Decl. ¶¶ 8–9.)  Labriola and the customer went to the VIP room so the customer could purchase $1,000 in Banana Bucks[14] on his credit card.  (Labriola Dep. 58:11–59:19; Second Labriola Decl. ¶¶ 10–12.)  Labriola explained that the Club's policy required identification for all credit card transactions; this customer did not have a photo ID, so he needed approval for his credit card transaction from the Club management.  (Labriola Dep. 58:11–59:19; Second Labriola Decl. ¶¶ 13–20, 30.)

Labriola testified that the customer did purchase the Banana Bucks on his credit card.  (Labriola Dep. 64:8–16.)  The Club's credit card records reflect one transaction above $1,000 for that night, in which a customer purchased $1,500 of Banana Bucks (and there is no ID on file for the transaction).  (Credit Card Records [94] at 0747.)  According to Marchese, the customer "would have received the Banana Bucks at the time of the transaction[,]" and the customer "signed a document indicating that he received the Banana Bucks."[15]  (Marchese Aff. ¶ 6.)  By signing the receipt, the customer "acknowledge[d] receipt of goods and/or services in the amount of the total shown herein[.]"  (Ex. 1 to Second Labriola Decl. [92-3].)  Labriola claims that she saw the customer receive "some" of the Banana Bucks, but the customer did not give

---

[13]     Martinez also testified that Labriola told her that the customer had invited Labriola to "meet elsewhere outside of the [C]lub."  (Martinez Dep. 166:4–12.)

[14]     Banana Bucks are apparently purchased by customers with a credit card (with a premium charged) and used to tip dancers, who can redeem them for cash from the Club.  (*See* Kalicki Aff. ¶¶ 7, 23; Marchese Aff. ¶¶ 7–8; Vitzileos Aff. ¶¶ 4–6.)

[15]     Plaintiffs move to strike this portion of Marchese's deposition, asserting that this document had not been produced in discovery.  As Plaintiffs acknowledge, however, motions to strike are "strongly disfavored."  (Pl.'s Resp. to DSOF ¶ 72.)  Plaintiffs themselves attached to their own filing the credit card slips that the customer signed when his credit card was charged.  (Credit Card Records [94] at 0747.)  The motion to strike Marchese's testimony is denied.

them to her.  (Second Labriola Decl. ¶ 23.)  At her deposition, Labriola said that she "was under the impression that [she] would get the Banana Bucks when [she] went upstairs[.]"  (Labriola Dep. 59:21–60:7.)  In a subsequent declaration, Labriola recalled that Vitzileos and the customer himself told her that she would get the money when she checked out.  (*See* Second Labriola Decl. ¶¶ 23, 35.)  Both Marchese and Vitzileos averred that the Club does not take possession of tips for any dancer, and deny that the Club took the Banana Bucks that the customer bought.  (Vitzileos Aff. ¶¶ 5–8; Marchese Aff. ¶ 8.)

Labriola testified that after the customer purchased the Banana Bucks, she and the customer returned to his table and continued to talk.  (Labriola Dep. 61:5–20.)  Labriola testified that when she was ready to leave, she went to collect her share of the night's dance fees.  (*Id.*)  At that point, Vitzileos and Marchese fired her.  (*Id.*)  Labriola claims that she never received the promised $1,000 tip.  (*Id.* at 59:21–60:7.)

### 3.    Lapina: Week of August 3, 2015

The parties dispute Lapina's hours and earnings for the week of August 3, 2015.  While Defendant claims she worked 34.25 hours that week, Lapina contends that she worked 38 hours.  She cites Kalicki's deposition, in which Kalicki concluded, from some unidentified document, that Lapina had worked 38 hours that week.  (Dep. of Tiffany Kalicki, Ex. 5 to PSOAF ("Kalicki Dep.") [92-4] 105:11–20.)  Kalicki testified that this document was "approximate from [her] records."  (*Id.*)

Lapina's Summary Chart (updated from the Club's original activity logs that Kalicki created for the Club's accounting) in the record, by contrast, shows fewer hours.  (Lapina Summary Chart.)  The Summary Chart and the House Mom Daily Log[16] list Lapina's start times for the six nights she worked that week as follows:

---

[16]    The House Mom Daily Log identifies Lapina by her stage name, "Marina." (Kalicki Dep. 53:4–6.)

| Start Time | |
|---|---|
| 8/3/2015 | 9:53 PM |
| 8/5/2015 | 9:00 PM |
| 8/6/2015 | 10:22 PM |
| 8/7/2015 | 10:25 PM |
| 8/8/2015 | 10:40 PM |
| 8/9/2015 | 7:15 PM |

(Lapina Summary Chart; Ex. B to Kalicki Aff.)

As for Lapina's end times, the Club does not keep records of when individual dancers finish dancing for the night, but as noted earlier, the Summary Chart generally assumes that Lapina left the Club when it closed. For her August 3 shift, however, Defendant has provided a transportation receipt showing that Lapina left the Club and took a car service to another location at 1:51 AM (Ex. F to Kalicki Aff. [79-6] at 015 (showing the receipt for the morning of August 4).) Lapina agrees that she left the club before 2:00 AM, well before the 4:00 AM closing time that day, on the morning of August 4. (Lapina Dep. 56:6–57:21.)

The parties also dispute the total amount that Lapina earned over the course of this week. Defendant's Summary Chart shows $575 of gross dance fees that Lapina earned and $318 of fees she paid, for net earnings of $257. (Lapina Summary Chart.) Lapina's own "chart of compensation" (again, the court is uncertain what records she used to create this chart) confirms that the amount of compensation, net of fees, that Lapina earned was $257. (Ex. 6 to PSOAF.) Yet Plaintiffs nevertheless claim that Lapina actually paid $433 in fees that week, and therefore earned just $142 (PSOAF [92] ¶ 57)—that is, Lapina apparently believes that her own "chart of compensation" is inaccurate. The support for this claim is Kalicki's deposition. Again referring to an unknown document, Kalicki gave the following testimony:

```
Q:      Can you add $220, $95, and $3, please?
A:      $318.
Q:      Okay.  And that's all the fees that [Lapina] paid to the Pink Monkey
        according to this activity log and the business records from which this
        activity log was generated, correct?
A:      That's not correct.
Q:      What am I missing?
A:      The dances.
```

| | |
|---|---|
| Q: | The dances? What do you mean? Oh, you're right. You are right. |
| A: | She paid $70. |
| Q: | Okay. Thank you. I appreciate that. So that is the CDHS.[17] |
| A: | Yes. |
| Q: | So add that in, please. |
| A: | $115 on that column. I said $70 because I was looking at one day but— |
| Q: | Can you add $115 to $318? |
| A: | $433. |
| Q: | Between the DJ/house mom fee, the host fee, the banana bucks fee, and the fees paid for the cabana dances, what's the total amount of fees that Ana paid to the Pink Monkey? |
| A: | Sorry. I cleared it. |
| Q: | It's okay. My figure is $433. |
| A: | $575 was what she made. |
| Q: | So can you subtract $433 from $575? |
| A: | $142. |
| Q: | All right, Anna, according to this activity log and the business record which create that log, Anna['s] net compensation was $142 for the week of August 3rd to August 9th, 2015, correct[?] |
| A: | Not including cash tip, correct. |

(Kalicki Dep. 112:8–113:17.) Neither party has provided the document Kalicki referred to during this testimony, but Defendant claims that the $115 is a miscalculation, because it double-counts the Club's portion of the dance fees charged to customers. As explained above, the Club charged a customer $30 for a cabana dance, for which the Club received $5 and the dancer received $25. Defendant asserts the $575 that Lapina earned (a multiple of $25, not $30) reflected her $25 net share of each cabana dance, not the full $30 cabana dance fee paid by the customer. Therefore, Defendant claims, deducting the Club's portion of the cabana dance fees effectively double-counts fees purportedly paid by Lapina to the Club.

### 4.    Lapina: Week of August 10, 2015

The parties agree that Lapina worked just three hours during the week of August 10, 2015, all on August 11. (Pl.'s Resp. to DSOF ¶ 46.) Yet they disagree about how much Lapina earned during those three hours. Plaintiffs claim that Lapina recovered nothing for that day. (*Id.* at ¶¶ 45–46, 48.) In support, Plaintiffs cite the deposition testimony of James Marchese (*id.*),

---

[17]    Kalicki defined this as "cabana dance house which means that's the money that . . . [dancers] paid to the house for the cabana dances" (Kalicki Dep. 97:6–11), or the $5 portion of the cabana dance fee that the Club would keep.

who testified that Lapina had paid no fees to the Club on August 11. Again referring to some documents that are not in the record, Marchese testified:

> Q: And Exhibit 20 is a packet of logs and envelopes from August 11, 2015, would you agree?
> A: Yes.
> . . . .
> Q: Looking on the second page, the house fees, [Lapina's] name is found on slot eight, correct?
> A: Correct.
> Q: While there is a $50 due, the word in the paid column is the word "gone," correct?
> A: Correct.
> Q: Are you aware if, according to the document, [Lapina] paid the $50 house fee?
> A: She did not.
> Q: And the same thing is found for the house mom fee for $40?
> A: Correct.

(Dep. of James Marchese, Ex. C to Def.'s Resp. to PSOAF ("Marchese Dep. in Reply") [96-3] 98:7–24.) As the court understands things, the "packet of logs and envelopes" (not part of the record in this case) support a determination that Lapina did not pay the "house fee" or the "DJ/House Mom" fee for August 11. These documents do not show that Lapina *collected* no dance fees for that night, however:

> Q: Turning to the next, the dance fees is zero, so according to this, she had no cabana dances that evening?
> A: Correct.
> Q: So going back—
> A: I'm sorry. Let me—no, that's not correct.
> Q: Ok.
> A: She has a zero dance fee. It doesn't mean she didn't do any. See, because when they leave, if they're owed money, I pay them their money. If they've done dances or things like that, I don't bother to go talk to them, I don't bother to collect their fees, obviously, and they just go. So it could very well be that she owed something for dances. . . .
> Q: So did Anna Lapina have any cabana dances on August 11, 2015?
> A: I have no idea. But that number does not reflect that she didn't. It just reflects that nothing was collected for them.
> Q: Okay. Who would know how many cabana dances Anna Lapina had on August 11, 2015?
> A: A dance sheet. I'm not sure. That's, kind of, a walking record from the host. I'm not sure if it goes—it does go in the envelopes, but I don't know—my answer to that question is I don't know where it's at.

(*Id.* at 99:1–100:12.)   Plaintiffs also rely on Kalicki's testimony in support of their claim that Lapina received no compensation for that date.   (Pl.'s Resp. to DSOF ¶¶ 45–46, 48.)   Like Marchese, Kalicki did testify (again, referring to a document not in the record), that Lapina "did not do any lap dances" or recover compensation  on August 11, 2015.  (Kalicki Dep. 92:6–18.)[18] Less than two months after her deposition, however, Kalicki provided an affidavit in which she stated that the cabana dance log showed that Lapina did perform five cabana dances on August 11.   (Kalicki Aff. ¶ 16.)   The cabana dance log does in fact indicate that Lapina performed five cabana dances that night.[19]   (Ex. G to Kalicki Aff. [79-7].)   Finally, the Lapina Summary Chart (which the Club prepared using the cabana dance sheet, House Mom Daily Log, transportation receipts, and other records) reflects that Lapina performed five cabana dances and received $150, or $30 per cabana dance, that night.  (Lapina Summary Chart.)

## II.     Procedural History

Labriola initiated a class action against Defendant on May 11, 2015.   In an amended complaint filed on October 30, 2015, Labriola and Lapina alleged that Defendant violated the FLSA and IMWL by (1) failing to pay Plaintiffs and other class members minimum wages and overtime pay, and (2) requiring Plaintiffs to pay fees from their tip money.  (First Am. Compl. [27] at 20–23.)   Plaintiffs also alleged claims of unjust enrichment and quantum meruit, on the grounds that Defendant "unjustly receiv[ed] the value of Plaintiffs['] labor without providing proper compensation[,]" and retaining Plaintiffs' tips and wages.[20]  (First Am. Compl. at 23–24.)

---

[18]      Kalicki also testified to a second unidentified document that apparently also reflected that Lapina did not perform cabana dances that night.  (Kalicki Dep. 95:23–98:12; *see* Kalicki Dep. 99:21–100:24 (noting documents that apparently show that Lapina paid no fees on August 11).)

[19]      The Club did not produce the cabana dance log until a week after Kalicki's deposition.  (Ex. D to Def.'s Resp. to PSOAF [96-4].)

[20]      The Amended Complaint also named two John Doe Defendants, who "manage[d] and control[ed] the operation of the private club and dictate[d] the employment policies of the club including but not limited to the decision to classify the dancers as independent contract[or]s (and/or lessees) and to no[t] pay dancers minimum wage and/or overtime wages and/or require[d] that dancers split their tips with the club."  (First Am. Compl.

Defendant moved to dismiss the complaint, and the court granted the motion in part. The court dismissed the portion of the FLSA and IMWL claims concerning the alleged fee payments/seizure, because the FLSA and IMWL do not support such a claim. *Labriola v. Clinton Entm't Mgmt.*, LLC, No. 15 C 4123, 2016 WL 1106862, at *4–5 (N.D. Ill. Mar. 22, 2016). The court also dismissed Plaintiff Labriola's claim for overtime pay as insufficiently pleaded, *id.* at *3, and dismissed the unjust enrichment/quantum meruit claims based on allegedly unpaid minimum wages and overtime wages, because the FLSA preempts such common law claims. *Id.* at *5. The following claims remain: both Plaintiffs' minimum wage claims under the FLSA and the IMWL; Lapina's overtime claims under the FLSA and the IMWL; and both Plaintiffs' unjust enrichment and quantum meruit claims for allegedly confiscated tips.

Plaintiffs filed a motion to certify an FLSA collective action on the overtime claims only (Pl.'s Mot. for Certification of Collective Action [40]; *see* Pl.'s Mem. in Supp. of Mot. for Certification of Collective Action [41]), and a motion to certify a class of all dancers at the Pink Monkey under the IMWL. (Pls.' Mot. to Certify a Rule 23 Class Action Under the Ill. Minimum Wage Law [43].) The court granted the motion for the FLSA collective action, and stayed the motion for IMWL certification pending the completion of class-based discovery. (Min. Order, May 6, 2016 [42]; Min. Order, Jun. 9, 2016 ([46].) Three additional plaintiffs have opted in to the FLSA collective action. (FLSA Consents [57], [62], [66].) On October 12, 2016, Defendant filed this motion for summary judgment on all of Labriola's and Lapina's claims [77]. For the reasons stated below, the court grants the motion with respect to the FLSA claim and the tip confiscation claim, and dismisses the remaining claims without prejudice under 28 U.S.C. § 1367(c). Plaintiffs' motion for class certification is therefore stricken as moot.

---

at 5.) Plaintiffs stated that they would identify the John Doe Defendants when their identities were discovered, but they have not directed the court to any information regarding the John Doe Defendants, despite the amount of discovery that has taken place. The court therefore dismisses the claims against the John Doe Defendants with prejudice.

"Summary judgment is proper if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (internal citation and quotation marks omitted). A genuine dispute of material fact exists "when, based on the evidence in the record, a reasonable jury could return a verdict for the nonmoving party." *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 488 (7th Cir. 2014). In determining whether there is such a dispute, the court views the record in the light most favorable to the non-movant. *Spurling*, 739 F.3d at 1060. "[E]vidence offered to support or oppose summary judgment must be admissible at trial[.]" *Johnson v. Holder*, 700 F.3d 979, 982 (7th Cir. 2012) (citing *Luster v. Illinois Dep't of Corr.*, 652 F.3d 726 (7th Cir. 2011)).

I.      **FLSA Claims**

Courts have generally applied the same analysis to both FLSA and IMWL claims. *See, e.g., Condo v. Sysco Corp.*, 1 F.3d 599, 601 n.3 (7th Cir. 1993) (adopting the parties' agreement that the FLSA and the IMWL are coextensive, as supported by the Illinois Administrative Code and Illinois case law). The FLSA requires that employers "engaged in commerce or in the production of goods for commerce" pay employees at least $7.25 per hour, 29 U.S.C. § 206, while the Illinois minimum wage has been $8.25 per hour since July 2010. 820 ILCS 105/4. An employer must also pay such employees one and one-half times the straight-time wage for hours worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1). Independent contractors, however, do not receive the FLSA's protections. *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 322 (7th Cir. 1995).

A.      **Employees or Independent Contractors**

Defendant contends that Plaintiffs are independent contractors, not employees, and therefore not subject to the FLSA. The Club itself classified the dancers as independent contractors (DSOF ¶ 16), but this is not dispositive. Instead, courts look to the "economic

reality" of the working relationship.  *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir.

1987).  While there is no bright line test, courts consider the following factors:

(1)     the nature and degree of the alleged employer's control as to the manner
        in which the work is to be performed;
(2)     the alleged employee's opportunity for profit or loss depending upon his
        managerial skill;
(3)     the alleged employee's investment in equipment or materials required for
        his task, or his employment of workers;
(4)     whether the service rendered requires a special skill;
(5)     the degree of permanency and duration of the working relationship;
(6)     the extent to which the service rendered is an integral part of the alleged
        employer's business.

*Lauritzen*, 835 F.2d at 1535 (citations omitted).

There a number of factual disputes that implicate these factors.  For example, the parties

dispute the degree of control that the Club exercised over what the dancers wore.  Dancers

were allowed to provide their own outfits, but the Handbook lists restrictions about their

clothing—they were expected to wear dresses, and the dresses had to meet certain

requirements.  (Pl.'s Resp. to DSOF ¶ 28.)  Plaintiffs argue that these restrictions indicate a high

degree of control.  Defendant contend that the Club did not actually exercise such control,

because Pink Monkey employees testified these restrictions were not actually enforced and

were merely "suggestions."  (DSOF ¶ 30.)  There is no evidence on whether dancers were sent

home if they did not wear dresses, so the court is not certain whether this Handbook provision

was truly a "rule" or a mere "suggestion."

The parties present disputes with respect to the other factors, as well.  Regarding the

second factor, for example, Defendants argue that dancers controlled their own opportunity for

profit and loss because they had to persuade customers to purchase dances from them, as

opposed to other dancers.  Plaintiffs point out, however, that the Club, not the dancers,

controlled the advertising to customers and the dance prices, both of which significantly impact

the dancers' individual profits.  Yet the record is silent regarding a number of circumstances that

would likely affect the dancers' ability to profit: the number of customers at the Pink Monkey

compared to the number of dancers, whether dancers could work for the number of shifts that

18

they desired, and whether dancers effectively competed with one another to dance for customers. The court is accordingly unable to accurately assess the dancers' opportunity for profit and loss.

Because the test is fact-specific and multi-factoral, these uncertainties preclude summary judgment on this issue. Indeed, courts have come to opposite conclusions in other cases involving exotic dancers. In *Hart v. Rick's Cabaret International, Inc.*, 967 F. Supp. 2d 901, 917–20 (S.D.N.Y. 2013), dancers were subject to rules regarding their clothing and behavior, and the defendant invested much more in the business than the dancers themselves. The court also concluded that the dancers did not have the specialized skills of an independent contractor, and the dancers were therefore properly classified as employees. *Id.* at 920–22. In *Matson v. 7455, Inc.*, No. CV 98-788-HA, 2000 WL 1132110, at *4 (D. Or. Jan. 14, 2000), the dancers had agreed to be independent contractors and were responsible for their own taxes (just as in this case). The court found that the fact that the dancers were paid based on the number of dances they did indicated that they themselves, not the defendant, controlled their ability to profit through skill, and the dancers were therefore independent contractors. *Id.* The genuine dispute over these facts precludes summary judgment.[21]

**B.  Assuming that Dancers are Employees**

Even if the dancers are employees, Defendant argues that it is nevertheless entitled to summary judgment because Labriola and Lapina's compensation satisfies the requirements of the FLSA. As explained below, for each week that Plaintiffs worked at the Club, they received the minimum wage and did not work more than 40 hours. Before addressing this argument, the court turns to two threshold issues: (1) whether the dance fees that Defendant collected were tips, or whether they instead counted toward Defendant's FLSA obligations; and (2) whether the

---

[21] The fact that the IRS concluded that the dancers at the Pink Monkey were independent contractors during the Club's most recent audit for 2013 (DSOF ¶ 33) does not eliminate any genuine dispute over these factors.

time that dancers spent at the Club before checking in and after checking out were principal work activities, or should be excluded from the number of hours worked.

### 1. Tips or Service Charges

When Plaintiffs danced at the Club, the Club charged fixed dance fees, a portion of which were later distributed to dancers. Plaintiffs contend that these dance fees are tips, while Defendant argues that they are service charges. Service charges that are distributed from employers to employees are counted against an employer's minimum wage obligations under the FLSA, while tips are not; employers must still pay tipped employees a wage. *See* 29 C.F.R. §§ 531.50, 531.55.

Regulations provide some guidance on how to distinguish between a tip and a service charge. "A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for him[;]" in other words, whether to give a tip and the amount of any tip is within the customer's discretion. 29 C.F.R. § 531.52. "A compulsory charge for service[,]" by contrast, is not a tip. 29 C.F.R. § 531.55. Courts generally agree that service charges must be included in an employer's gross receipts. *See Hart*, 967 F. Supp. 2d at 929–30 (concluding that fees included in the employer's gross receipts is a bright-line requirement for fees to be service charges); *Reich v. ABC/York-Estes Corp.*, No. 91 C 6265, 1997 WL 264379, at *5–6 (N.D. Ill. May 12, 1997); *see also Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1177–78 (7th Cir. 1987) (holding that a non-discretionary percentage charge is not a tip).

Plaintiffs do not dispute that the Club set fixed prices for dances. Plaintiffs also do not dispute that the dancers themselves received a fixed portion of the fees for each dance, depending on the type of dance performed. Finally, the dance fees were included in the Club's gross receipts.[22] Because these dance fees were (1) collected by the Club as part of its gross

---

[22] Plaintiffs do not admit this fact, but do admit that Michael Weisberg (as noted above, the Club's accountant and tax preparer) so testified. (Pl.'s Resp. to DSOF ¶ 49.) As noted above, the Club's accounting records reflect the inclusion of dance fees in gross receipts. Because Plaintiffs point to no evidence contradicting Weisberg's testimony or the Club's accounting records, the court deems this admitted. (Pl.'s Resp. to DSOF ¶ 49.)

receipts, (2) distributed to the dancers, and (3) mandatory, rather than discretionary, amounts, these fees are service charges, not tips. The dance fees therefore count against Defendant's minimum wage obligations.

## 2. Preliminary / Postliminary Activities

Another threshold issue is whether activities such as "cashing out, checking out with the house mom[,] and changing clothing" must be considered time worked for the FLSA. (PSOAF ¶ 78.)[23] Plaintiffs contend that these activities caused Lapina to be at the Club after 4:00 AM, meaning that she worked more than 40 hours in a week. "[A]ctivities which are preliminary to or postliminary to" "the principal activity or activities which [an] employee is employed to perform" are not part of the time used to calculate either minimum wages or overtime pay. 29 U.S.C. § 254(a).

In *Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 596 (7th Cir. 2012), *aff'd*, 134 S. Ct. 870 (2014), the Seventh Circuit examined the time required to change clothes in the context of 29 U.S.C. § 203(o), which allows such changing time to be excluded from FLSA time calculations pursuant to a collective bargaining agreement. *Id.* at 595–96. But the court's discussion of principal activities is instructive:

> [A worker] is required to wear work clothes, and for that matter he is required to show up for work. But he is not employed to show up or employed to change clothes. Not all requirements imposed on employees constitute employment. An employee may be required to call in when he is sick, but unless he is on paid sick leave he is not paid for the time it takes to place the call.

*Id.* Plaintiffs have not disputed the evidence that dancers were free to change clothes and put on make-up before arriving at the club, and did so on at least some occasions. Nor is there evidence that dancers were required by the Club to spend a certain amount of time at the Club preparing to dance before their shifts; in fact, in her deposition, Labriola contradicts her earlier declaration on this topic. Plaintiffs' changing clothes and applying makeup are not principal activities.

---

[23] Plaintiffs raise this in the context of Lapina's overtime claim, though it of course affects both Plaintiffs' minimum wage claims.

As for checking in and out, "[u]nder the FLSA, 'employees cannot recover for otherwise compensable time if it is *de minimis*.'" *Gonzalez v. Farmington Foods, Inc.*, 296 F. Supp. 2d 912, 927 (N.D. Ill. 2003) (quoting *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir.1984)). "It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." *Sandifer*, 678 F.3d at 593 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946)); *see Lindow*, 738 F.2d at 1063–64 ("an average of 7 to 8 minutes a day reading the log book and exchanging information" was *de minimis*). Lapina has offered no evidence of how much time it took her to check in and out at the end of the night.[24] She simply speculates about what her hours would be "if" she had worked an extra hour each day, but offers no evidence that checking out actually took an hour each day (or even an hour cumulatively) over the course of a week. (Lapina Dep. 207:13–08:14.)[25] As the court understands their argument, Plaintiffs assume that the mere fact that the check-out takes place after 4:00 AM means that checking out is part of working time under the FLSA. (Pl.'s Resp. 22–23.) No evidence or law supports that assumption.[26] The only evidence about the time that check-out consumes is Marchese's estimate that the process takes "probably . . . less than 30 seconds[,]" though admittedly the dancers cannot check out all at once. (Marchese Dep. 58:6–16.) There is thus no genuine dispute that these activities are not principal work activities, and the court will not consider them as part of dancers' working hours.

### 3.    Minimum Wage Claims

The court thus turns to Plaintiffs' minimum wage claims. The Department of Labor calculates both wages and hours worked on a weekly basis; that is, the Department determines

[24]    Though Martinez acknowledged that all dancers did not check out precisely at 4:00 AM (Martinez Dep. 32:5–16), this testimony does not contradict Defendant's assertion that the checking-out time is *de minimis.*

[25]    Plaintiffs also cite a page from Lapina's deposition that is not included in the record. (Pl.'s Resp. to DSOF ¶ 63 (citing Lapina Dep. 213).)

[26]    Plaintiff Lapina's claim that she "counts her work time from the time she arrives to the time she leaves" is irrelevant (PSOAF ¶ 59); the FLSA does not ask when employees believe that they work, but when they actually work.

the hourly wage by dividing weekly earnings by hours worked, and determines whether overtime pay is due by considering the number of hours in a workweek (a seven day period). *Fact Sheet #23: Overtime Pay Requirements of the FLSA*, U.S. DEP'T OF LABOR, WAGE & HOUR DIV., https://www.dol.gov/whd/regs/compliance/whdfs23.pdf (rev. July 2008).[27] In support of their claims that both Plaintiffs earned less than the minimum wage while working at the Club, Plaintiffs cite repeatedly to testimony that refers to unknown documents not in the record. Because Plaintiffs cite to no admissible evidence supporting their minimum wage claims, the court concludes there is no genuine dispute on this issue.

### i. Labriola

Labriola asserts that her earnings fell short for one week of her employment: the week of February 2, 2015. (Pl.'s Resp. to DSOF ¶ 45.) It is undisputed that Labriola worked two days that week—February 2 and February 3—and that she earned $113 (after paying fees)[28] for those two days. (Pl.'s Resp. to DSOF ¶ 45; Labriola Summary Chart.) The parties dispute the number of hours she worked on those two days. Defendant claims that Labriola worked 14 hours, rounding up from the data in Defendant's Summary Chart:

| Start Time | End Time | Daily Hours |
|---|---|---|
| 2/2/2015 7:15 PM | 2/3/2015 1:51 AM | 6.60 |
| 2/3/2015 7:35 PM | 2/4/2015 2:52 AM | 7.28 |
| | | **13.88** |

Labriola contends that she worked 9 hours on each of these two days, or 18 hours total. She apparently does not dispute the above start times, but instead asserts that she worked until after the Club's regular 4:00 AM closing time. (Second Labriola Decl. ¶¶ 40–44.)

---

[27] Ex. 7 to PSOAF [92-5].

[28] The court assumes that it is appropriate to deduct the fees that dancers paid from the gross earnings to determine net earnings. Defendant does not concede that deducting these fees is appropriate (*see* Def.'s Reply Br. in Supp. of Mot. for Summ. J. ("Reply") [95] 6), likely because Defendant insists that the dancers are independent contractors. But the parties do not explicitly address the issue, and the court need not decide it.

Defendant's assertions concerning Labriola's work hours are supported by the time cards of the person the Club employed as the "Door Girl," who "would have left around the same time as, or after, Labriola" (Kalicki Aff. ¶ 13), because part of her job was to call cabs for dancers and ensure they left safely.   By contrast, Labriola cites no admissible evidence in support of her claim that she worked until after 4:00 AM.[29]   She cites a page of Marchese's deposition that is not in the record.   (Pl.'s Resp. to DSOF ¶ 45 (citing Marchese Dep. 104).)   Labriola also claims that the "Pink Monkey's business records and [her] own chart of compensation" support her claim that she worked 18 hours (Second Labriola Decl. ¶ 39; *see* Pl.'s Resp. to DSOF ¶ 45), but she does not identify the business records she claims to rely on, and the court did not locate any such records.   She also does not explain how she created her "chart of compensation," which simply states that she worked 9 hours each day, without any reference to start or end times.   (Ex. 6 to PSOAF.)   Finally, Labriola points to no testimony where she actually recalls working until 4:00 AM on those days.

As a result, there is no genuine dispute that Labriola worked until 1:51 AM the night of February 2–3 and 2:52 AM the night of February 3–4.   Using Labriola's undisputed earnings of $113 (net of fees) Labriola's hourly wage for the week was $8.14 per hour.   Even if the court rounds to 14 hours, as Defendant has, Labriola's hourly wage was $8.07 per hour.   Either way, Labriola earned more than the federal minimum wage.

### ii.     Lapina

The parties dispute Lapina's hourly wages for two weeks during her time at the Pink Monkey: the week of August 3, 2015 and the week of August 10, 2015.

### a.     Week of August 3, 2015

For the week of August 3, the parties dispute both the number of hours Lapina worked and the amount she earned.   The court first addresses Lapina's hours.   Defendant presents

---

[29]     Plaintiffs do not cite to any evidence from Labriola about how long after 4:00 AM she allegedly left; she merely states "leaving at 4[:]00 AM was impossible." (Second Labriola Decl. ¶ 42.)

documentary evidence supporting its version of when Lapina started and ended each shift, as explained above. Plaintiffs nevertheless insist that "Pink Monkey's Activity Log shows Lapina worked a total [of] 38 hours" for the week of August 3, 2015.[30] (Pl.'s Resp. to DSOF ¶ 45.) But the Summary Chart *in the record* does not support this assertion. (Lapina Summary Chart.) Plaintiffs cite Kalicki's deposition, in which Kalicki reviewed some document that apparently supports the conclusion that Lapina had worked 38 hours that week. (Kalicki Dep. 105:11–20.) The parties' failure to place this document in the record (or identify it) is disappointing, and Kalicki's testimony cannot be used to prove the contents of this document. *See* FED. R. EVID. 1002.

No other evidence supports Plaintiffs' contention that Lapina worked 38 hours in that week.[31] The court thus finds no genuine dispute that Lapina worked the hours as listed in the Lapina Summary Chart, which add up to 34.27 hours, as shown below:

| Start Time | End Time | Daily Hours |
|---|---|---|
| 8/3/2015 9:53 PM | 8/4/2015 1:51 AM | 3.97 |
| 8/5/2015 9:00 PM | 8/6/2015 4:00 AM | 7.00 |
| 8/6/2015 10:22 PM | 8/7/2015 4:00 AM | 5.63 |
| 8/7/2015 10:25 PM | 8/8/2015 4:00 AM | 5.58 |
| 8/8/2015 10:40 PM | 8/9/2015 4:00 AM | 5.33 |
| 8/9/2015 7:15 PM | 8/10/2015 2:00 AM | 6.75 |
| | | **34.27** |

The parties also dispute the total amount that Lapina earned over the course of this week. The Lapina Summary Chart shows that she collected $575 of gross dancer fees paid fees in the amount of $318, for a net amount of earnings of $257.

---

[30] Plaintiffs appear to have withdrawn their earlier allegation that Lapina worked "approximately 54 hours" in one particular week. (First Am. Compl. at 10.) The court is skeptical that Plaintiff Lapina could so overestimate her own work hours.

[31] Plaintiffs also cite Lapina's testimony in which she speculates what her hours would have been if she worked an extra hour each day that week. (Lapina Dep. 207:13–08:14.) That this hypothetical speculation is not evidence is obvious.

| Start Time | End Time | Daily Hours | Gross Earnings | DJ/House Mom Fee | Host Fee | Banana Bucks Fee | Total Fees | Net Earnings |
|---|---|---|---|---|---|---|---|---|
| 8/3/2015 9:53 PM | 8/4/2015 1:51 AM | 3.97 | $ - | $ 40 | $ - | $ - | $ 40 | |
| 8/5/2015 9:00 PM | 8/6/2015 4:00 AM | 7.00 | $ 25 | $ 40 | $ 5 | $ - | $ 45 | |
| 8/6/2015 10:22 PM | 8/7/2015 4:00 AM | 5.63 | $ 150 | $ 40 | $ 25 | $ - | $ 65 | |
| 8/7/2015 10:25 PM | 8/8/2015 4:00 AM | 5.58 | $ 50 | $ 40 | $ 10 | $ - | $ 50 | |
| 8/8/2015 10:40 PM | 8/9/2015 4:00 AM | 5.33 | $ 350 | $ 40 | $ 55 | $ 3 | $ 98 | |
| 8/9/2015 7:15 PM | 8/10/2015 2:00 AM | 6.75 | $ - | $ 20 | $ - | $ - | $ 20 | |
| | | 34.27 | $ 575 | | | | $ 318 | $ 257 |

(Lapina Summary Chart.)[32]

Plaintiff Lapina's own "chart of compensation" confirms that she earned $257, net of fees, that week. (Ex. 6 to PSOAF.) Yet Plaintiffs now contend that Lapina actually paid $433 in fees, and therefore earned just $142. (PSOAF ¶ 57.) Again, they support this claim with Kalicki's deposition, referring to an unidentified document, that, according to Kalicki, shows that Lapina paid $115 of dance fees, in addition to the other, undisputed amounts (the DJ/House Mom fee, Host fee, and Banana Bucks fee).[33] (Kalicki Dep. 112:8–113:17.) Neither party has provided this document, nor can the court find any support for the notion that Lapina paid an additional $115 fee during that week.[34] As above, the court will not consider testimony about the contents of a document not in the record. *See* FED. R. EVID. 1002. There is therefore no

---

[32] The court notes that the Summary Chart also has another column labeled "HS fee." (Lapina Summary Chart.) It is labeled "free" for each day of the week in question, except August 5, where the entry "Owes 50" appears. (*Id.*) Neither party has explained this column, and in particular, Plaintiffs have not suggested that this represents another fee that Lapina paid during this week. Accordingly, the court will not speculate as to the significance of this entry.

[33] Dancers were charged a ten percent fee to convert Banana Bucks to cash. (Kalicki Aff. ¶ 23.)

[34] Defendant argues persuasively that the $115 number is a miscalculation that inappropriately refers to the Club's portion of the dance fees (for each cabana dance performed, the Club would charge $30, of which the dancer would receive $25 and the Club would receive $5). Although in one sense a dancer "earns" $30 and "pays a fee" of $5 for each dance, the Summary Chart generally nets this fee out and shows only the compensation to the dancer: $25 per dance. (Lapina Summary Chart.) The Summary Chart shows that Lapina performed 23 dances total for the week. The Club's portion of the cabana dance fees for those dances would be $115 (23 x $5), but it would be inappropriate to deduct those fees from Lapina's $25 per dance earnings, as the $25 reflects the Club's subtracting $5 from the total $30 charges. More importantly, Kalicki acknowledged that the document she was reviewing showed Lapina as earning $25 per dance (Kalicki Dep. 110:12–23), so it would be inappropriate to subtract the Club's $5 portion again.

genuine dispute that Lapina earned $257 for the week of August 3. Calculated out, Lapina earned $7.50 per hour for that week, more than the federal minimum wage of $7.25.

### b. Week of August 10, 2015

The parties apparently agree that Lapina worked three hours during the week of August 10, 2015, all on August 11. (Pl.'s Resp. to DSOF ¶ 46.) Yet the parties disagree about how much Lapina earned during those three hours. Plaintiffs claim that Lapina had no compensation at all for that day. (*Id.* at ¶¶ 45–46, 48.) The testimony they cite, however, does not indicate that Lapina performed no *dances* that night; instead, Marchese testified that she had paid no *fees*. (Marchese Dep. in Reply 98:7–100:12.) Marchese did not know whether Lapina had performed any dances that night:

> Q:      So did Anna Lapina have any cabana dances on August 11, 2015?
> A:      I have no idea. But that number does not reflect that she didn't. It just reflects that nothing was collected for them.

(*Id.* at 100:1–5) (emphasis added). Plaintiffs also rely on Kalicki's testimony. (Pl.'s Resp. to DSOF ¶¶ 45–46, 48.) Kalicki referred to documents that purportedly show that Lapina paid no fees, and evidently concluded that Lapina performed no dances and earned no compensation. (Kalicki Dep. 92:6–18, 95:23–98:12, 99:21–105:10.) But as explained earlier, the fact that Lapina paid no fees does not mean she was not compensated for any dances. The court declines to consider Kalicki's testimony as to the contents of unidentified documents. *See* FED. R. EVID. 1002.

The cabana dance log for August 11, in contrast, *is* in the record and shows that Lapina performed five cabana dances that night. (Ex. G to Kalicki Aff. [79-7]; Marchese Dep. in Reply 100:6–12 (noting that the dance log would confirm whether Lapina had performed any dances that night).) Consistent with that log, Defendant's Lapina Summary Chart reflects that Lapina performed five dances and received $150, or $30 per cabana dance, that night.[35] (Lapina

---

[35]      Defendant points out that the Summary Chart not only shows that Lapina paid no fees that night, but that she also retained the Club's $5 portion of each dance fee charged to customers. (Reply 9 n.10.) As quoted above, Marchese testified that he typically does not take

Summary Chart.)  Because Plaintiffs have produced no admissible evidence contradicting this documentary evidence, there is no genuine dispute as to Lapina's earnings for this week.[36] Even if the Club had retained its $25 portion for the five cabana dances (though there is no evidence that is the case), Lapina earned $41.67 per hour for the three hours she worked that week (she would have earned $50 per hour if she retained the $25).

There is no genuine dispute over Lapina's or Labriola's wages or hours for the weeks at issue.  As described above, Lapina and Labriola were both paid above the federal minimum wage of $7.25 per hour for the disputed weeks.

### 2.    Overtime Claim

Lapina claims that she worked more than 40 hours "in her third week" of work, the week of August 3, 2015.  (Pl.'s Resp. to DSOF ¶¶ 52, 63.)  But as described above, it is undisputed that Lapina worked 34.27 hours that week.  Lapina's only support for this claim is her statement that that "if she worked just one more hour per day she would be owed overtime." (*Id.*)  This disingenuous assertion rests on nothing more than counterfactual speculation.  Summary judgment is therefore also granted on the FLSA overtime claim.

Four other plaintiffs have opted in to the FLSA collective for the overtime claims.  [*See* Docket Entries 40; 57, 62, 66, 67.)  The court will allow 21 days for these opt-in plaintiffs to present affidavits or records supporting their claims for overtime compensation.  If no opt-in Plaintiff comes forward, the court will enter summary judgment for Defendant.

---

fees out of a dancer's earnings on the last night a dancer ever works at the Club (Marchese Dep. in Reply 98:7–100:12), presumably because they leave and receive their earnings before the Club closes.

[36]    The court notes that Lapina's total compensation does not match her 2015 1099 IRS form.  Plaintiffs, however, have not suggested that the discrepancy can be attributed to any particular week, nor have they identified any evidence that connects the 1099 form to an hourly rate below the minimum wage.  Again, the court will not speculate absent clear evidence creating a genuine dispute over the material facts supported by Defendant's evidence.

## II.    State Law Claims

All claims remaining are state law claims.  "When only state law claims remain after federal claims have dropped out of the case, the district court enjoys broad discretion whether to relinquish supplemental jurisdiction over the state law claims."  *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016).  There is, in fact, "a presumption that the [district] court will relinquish jurisdiction over any remaining state law claims."  *Id.*  This presumption can be overcome when "(1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided."  *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514–15 (7th Cir. 2009) (internal citation and quotation marks omitted).  As explained below, it is absolutely clear that the claim regarding tips allegedly confiscated to pay fees should be dismissed, so the court retains jurisdiction over that claim and declines jurisdiction over the remaining claims.

### A.    Illinois Minimum Wage Law Claim

The court declines to exercise jurisdiction over the Illinois Minimum Wage Law claims, because these claims are more suitable for state court.  If the Pink Monkey dancers are in fact employees, rather than independent contractors, these facts indicate that Plaintiff Labriola's wage shortfall would be, at most, $2.50 (($8.25/hour[37] - $8.07/hour) x 14 hours), while Plaintiff Lapina's wage shortfall would be $25.70 (($8.25/hour - $7.50/hour) x 34.27 hours).  The court declines to exercise jurisdiction over this state-law dispute, which appears ripe for settlement.

### B.    Unjust Enrichment/Quantum Meruit

The basis for Plaintiffs' unjust enrichment and quantum meruit claims is the allegation that Defendant demanded and retained a portion of Plaintiffs' tips.  (First Am. Compl. at 23–24.)  Plaintiffs have essentially two claims here: first, that Defendant compelled Plaintiffs to pay a

---

[37]    This calculation applies the Illinois minimum wage for non-tipped employees, though the court is not certain whether that application is appropriate.  820 ILCS 105/4.

portion of their tips as fees, and second, that Defendant seized a $1,000 tip that a customer attempted to give Plaintiff Labriola on her last day of work.

Though the court declines to exercise jurisdiction over the second of these claims, the court notes that Plaintiffs have directly contradicted the allegation in their amended complaint that "Plaintiffs [were] paid no wages at all" and instead compensated only through tips. (First Am. Compl. at 4–5.) As explained above, the dance fees that customers paid were not tips. Plaintiffs' claim that dancers were paid only through tips is demonstrably not true. The court declined to dismiss this portion of the amended complaint because "Plaintiffs' only alleged compensation took the form of tips from customers, some . . . of which were seized by Defendants as fees." *Labriola*, 2016 WL 1106862, at *6. It is now clear that Defendant's retaining a portion of the dance fees was not confiscation of Plaintiffs' tips.

The court warned Plaintiffs about these allegations in its memorandum opinion denying Defendant's motion to dismiss on this issue. There, the court took notice of a document in another case brought by other dancers at the Pink Monkey: the Pink Monkey Handbook, in substantially the same form as in this case, which identified the Pink Monkey's *non-discretionary* dance fees and explained how they were shared with the dancers. *Id.* at *6 n.3. The court expressed concern that the Plaintiffs may have known that these dance fees were fixed, and therefore not tips, and cautioned that "allegations that are inconsistent with Plaintiffs' own understanding of Defendants' pay practices would be in bad faith." *Id.* Plaintiffs now do not dispute that Lapina and Labriola knew of this document. As explained below, Plaintiffs have presented no evidence that the Club seized tips to pay dance fees or any other fees. Accordingly, it is clear that summary judgment should be granted on this claim, and the court does so here.

### 1.    Tips Not Confiscated for Fees

Because the dance fees were service charges, not tips, Defendant's retention of a portion of those fees is, by definition, not confiscation of Plaintiffs' tips. But Plaintiffs also

contend that the Club seized cash tips that dancers received in addition to pay other fees: the house fee, the DJ/House Mom fee, etc. (Pl.'s Mem. in Resp. to Def.'s Mot. for Summ. J. [91] 25.) Defendant argues that these fees were not "seized" because dancers would pay them with cash that the dancers themselves had; the Club did not handle the dancer's tips. (Reply 13) Instead, Defendant contends, the dancers paid fees to receive the benefits of performing at the Club. (Def.'s Mot. for Summ. J. [77] 21.) Defendant cites to Lapina's testimony that Lapina paid her fees with cash she brought with her to the Club:

> Q:  So with respect to what you recall from the Pink Monkey, you would come to the Pink Money with cash so that you had enough money to pay for the house fee and for any DJ/house mom fee?
> A:  Yes.

(Lapina Dep. in Reply 131:9–13.) Plaintiffs contend that this shows only that she brought funds to pay the fees, not that she actually paid the fees from the money she brought. (Pl.'s Resp. to DSOF ¶ 65.) But that contention is inconsistent with the plain import of Lapina's testimony that she intended to pay the fees, even before she received the night's tips. Plaintiffs' claim that the tips were "seized" is unconvincing.[38] Labriola herself testified that she paid the fees before her shift started.[39] (Labriola Dep. 119:1–7.) There is no evidence that tips were "confiscated" or seized,[40] and summary judgment is granted on this claim.

---

[38]  The fact that dancers could deduct these fees as expenses on their tax returns also reinforces that they paid the fees voluntarily to receive the benefits of dancing at the Club. (*See* Ex. J to Kalicki Aff.; Ex. K to Kalicki Aff.)

[39]  As explained above, Plaintiffs' motion to strike this testimony is denied. Plaintiffs also deny this fact on the grounds that it refers to only one specific night, but Labriola's testimony clearly describes her general practice of paying fees at the beginning of a shift:

Q:  . . . At the end of the night when you closed out, would you pay fees?
A:  You paid the house mom, the DJ—you pay the house fee, the house mom and the DJ up front.
Q:  You would pay those with whatever money you had in your pocket when you walked in?
A:  Yes.

(Labriola Dep. 119:1–7.)

[40]  Labriola submitted a declaration in which she avers "Pink Monkey failed to pay me any wage, Pink Monkey monitored and exacted my tips[.]" (First Labriola Decl. ¶ 54.) This statement gives no indication of how Pink Monkey did this, or whether this is a reference to

## 2.    Alleged $1,000 Tip Seizure

The last remaining claim is Labriola's unjust enrichment or quantum meruit claim that Defendant seized a $1,000 tip that a customer tried to give her.  There is a dispute of fact about whether the Club management promised Labriola she would receive the $1,000 in Banana Bucks at the end of the night; there is testimony supporting both accounts.  The court will dismiss this claim without prejudice to litigation in state court.

## CONCLUSION

Defendant's motion for summary judgment [77] is granted on Plaintiff Labriola and Lapina's FLSA minimum wage claim and their claim regarding the alleged seizure of tips to pay fees and otherwise denied without prejudice.  Claims against John Does 1 and 2 are dismissed. If no other Plaintiff presents evidence in support of the overtime claim within 21 days, the court will grant summary judgment on that claim and dismiss the IMWL claims and the claim regarding the alleged retention of Labriola's $1,000 tip without prejudice.  Plaintiffs' motion for class certification [43] is denied without prejudice as moot.

ENTER:

Dated:  March 28, 2017

_____
REBECCA R. PALLMEYER
United States District Judge

---

taking a percentage of the dance fees, allegedly retaining the $1,000 tip, or seizing a portion of Labriola's other cash tips to pay fees.  More importantly, in her deposition, Labriola effectively withdrew this claim:

Q:    . . . Part of [paragraph] 54 reads Pink Monkey monitored my tips, you
          agree?
A:    They didn't really monitor my tips.

(Labriola Dep. 101:17–19.)